07-5291-cv
Bronx Household v. Board of Education

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**


August Term, 2010


(Argued: October 6, 2009                                    Decided: June 2, 2011)


Docket No. 07-5291-cv


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


THE BRONX HOUSEHOLD OF FAITH,
ROBERT HALL, and JACK ROBERTS,

            *Plaintiff-Appellees*,

v.

BOARD OF EDUCATION OF THE CITY OF NEW
YORK and COMMUNITY SCHOOL DISTRICT NO. 10,

            *Defendant-Appellants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X




Before:    WALKER, LEVAL, and CALABRESI, *Circuit Judges*.

        Defendants appeal from an order of the United States District Court for the Southern District of New York (Preska, *C.J.*) granting summary judgment to Plaintiffs and entering a permanent injunction barring the Board of Education of the City of New York from enforcing a rule that prohibits outside groups from using school facilities after hours for "religious worship services."  The Court of Appeals (Leval, *J.*) concludes that (1) because the rule does not exclude expressions of religious points of view or of religious devotion, but excludes for valid non-

discriminatory reasons only a type of activity – the conduct of worship services, the rule does not constitute viewpoint discrimination; and (2) because Defendants reasonably seek by this rule to avoid violating the Establishment Clause, the exclusion of religious worship services is a reasonable content-based restriction, which does not violate the Free Speech Clause. Accordingly, the judgment of the district court is reversed and the injunction barring enforcement of the rule against Plaintiffs is vacated.

Judge Calabresi concurs in the opinion and has filed an additional concurring opinion.

Judge Walker dissents by separate opinion.

JANE L. GORDAN, Senior Counsel (Edward F.X. Hart, Lisa Grumet, Janice Casey Silverberg, *on the brief*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, *for Appellants*.

JORDAN W. LORENCE, Alliance Defense Fund, Washington, D.C. (Joseph P. Infranco, Jeffrey A. Shafer, David A. Cortman, Benjamin W. Bull, *on the brief*), *for Appellees*.

Michael J. Garcia, United States Attorney for the Southern District of New York, New York, New York (David J. Kennedy, Assistant United States Attorney, Southern District of New York, Grace Chung Becker, Acting Assistant Attorney General, Dennis J. Dimsey, Eric W. Treene, Karl N. Gellert, Attorneys, Appellate Section, Civil Rights Division, U.S. Department of Justice, *on the brief*), *for Amicus Curiae* United States of America.

Mitchell A. Karlan, Gibson, Dunn & Crutcher LLP, New York, New York (Aric H. Wu, Farrah L. Pepper, Gibson, Dunn & Crutcher LLP, Carol Nelkin, Jeffrey P. Sinensky, Kara H. Stein, The American Jewish Committee, *on the brief*), *for Amicus Curiae* The American Jewish Committee.

Isaac Fong, Center for Law and Religious Freedom, Springfield, Virginia (Kimberlee Wood Colby, Gregory S. Baylor, *on the brief*), *for Amicus Curiae* The Christian Legal Society.

Eloise Pasachoff, Committee on Education and the Law, Association of the Bar of the City of New York, New York, New York (Jonathan R. Bell, Rosemary Halligan, Laura L. Himelstein, *on the brief*), *for Amicus Curiae* Association of the Bar of the City of New York.

LEVAL, *Circuit Judge*:

Defendants, the Board of Education of the New York City Public Schools and Community School District No. 10 (collectively, "the Department of Education" or "the Board"),[1] appeal from an order of the United States District Court for the Southern District of New York (Preska, *C.J.*), which granted summary judgment to Plaintiffs the Bronx Household of Faith ("Bronx Household"), a Christian church, and its pastors Robert Hall and Jack Roberts, and permanently enjoined the Board from enforcing against Bronx Household a Standard Operating Procedure ("SOP") that prohibits the use of school facilities by outside groups outside of school hours for "religious worship services." We conclude that the challenged rule does not constitute viewpoint discrimination because it does not seek to exclude expressions of religious points of view or of religious devotion, but rather excludes for valid non-discriminatory reasons only a type of activity – the conduct of worship services. We also conclude that because Defendants reasonably seek by the rule to avoid violating the Establishment Clause, the exclusion of religious worship services is a reasonable content-based restriction, which does not violate the Free Speech Clause. Accordingly, we reverse the judgment of the district court and vacate the injunction.

---

[1]The Board of Education of the City of New York has been reorganized and renamed the New York City Department of Education. *See, e.g.*, *D.D. ex rel V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 506 n.1 (2d Cir. 2006).

**BACKGROUND**

The relevant facts are familiar, and are not in dispute. *See Bronx Household of Faith v. Bd. of Educ. of the City of New York (Bronx Household III)*, 492 F.3d 89 (2d Cir. 2007). Under New York State law, a local public school district may permit its facilities to be used outside of school hours for purposes such as "social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community," as long as the uses are "nonexclusive and . . . open to the general public." N.Y. Educ. Code § 414(1)(c). Pursuant to this provision, New York City's Department of Education developed a written policy governing use of school facilities during after-school hours as part of its Standard Operating Procedures Manual. The policy, or SOP, permits outside groups to use school premises for the purposes described in the state law, when the premises are not being used for school programs and activities, but subject to limitations. In earlier stages of this litigation, SOP § 5.9 prohibited the use of school property for "religious services or religious instruction."[2] *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10 (Bronx Household I)*, 127 F.3d 207, 210 (2d Cir. 1997).

In 1994, Bronx Household applied to use space in the Anne Cross Mersereau Middle School ("M.S. 206B") in the Bronx, New York, for its Sunday morning "church service[s]." *Bronx Household of Faith v. Bd. of Educ. of the City of New York*, 226 F. Supp. 2d 401, 410

---

[2]SOP § 5.9 provided:

> No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school. However, the use of school premises by outside organizations or groups after school for the purposes of discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible.

*Bronx Household I*, 127 F.3d at 210.

4

(S.D.N.Y. 2002) (quoting First Affidavit of Robert Hall). According to Bronx Household's application, its services would include "singing of Christian hymns and songs, prayer, fellowship with other church members and Biblical preaching and teaching, communion, [and] sharing of testimonies," followed by a "fellowship meal," during which attendees "talk to one another, [and] share one another's joys and sorrows so as to be a mutual help and comfort to each other." *Id.* The Board denied Bronx Household's application under SOP § 5.9. *Bronx Household I*, 127 F.3d at 211.

Plaintiffs brought suit, contending that the Board's denial of Bronx Household's application constituted viewpoint discrimination in violation of the Free Speech Clause of the First Amendment. The district court granted the Board's motion for summary judgment, and dismissed the suit. *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, No. 95 Civ. 5501, 1996 WL 700915 (S.D.N.Y. Dec. 5, 1996) (Preska, *J.*). We affirmed, concluding that the Department of Education had created a limited public forum by opening school facilities only to certain activities, and that the exclusion of religious services and religious instruction was viewpoint-neutral and reasonable in light of the forum's purposes. *Bronx Household I*, 127 F.3d at 211-15, 217.

In 2001, however, the Supreme Court ruled in *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), that it was unconstitutional for a public school district in Milford, New York, to exclude from its facilities "a private Christian organization for children," which had requested permission to use space in a school building after school hours to sing songs, read Bible lessons, memorize scripture, and pray. *Id.* at 103. The Milford district's policy, in accordance with New York state law, permitted school facilities to be used for "social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the

5

community." *Id.* at 102 (quoting N.Y. Educ. Code § 414(1)(c)).  However, it prohibited use "by any individual or organization for religious purposes," which school district officials interpreted as prohibiting "religious worship" or "religious instruction." *Id.* at 103-04.  The Supreme Court concluded that the Good News Club was seeking to "address a subject otherwise permitted [in the school], the teaching of morals and character, from a religious standpoint," and, therefore, the school district's denial of the club's application constituted impermissible viewpoint discrimination in the context of a limited public forum. *Id.* at 109.

After the Supreme Court's decision in *Good News Club*, Bronx Household applied again, and its application was again denied. *Bronx Household of Faith v. Bd. of Educ. of the City of New York (Bronx Household II)*, 331 F.3d 342, 346-48 (2d Cir. 2003).  Plaintiffs brought a new action, and this time the district court, citing *Good News Club*, preliminarily enjoined the Board from denying the permit. *Bronx Household*, 226 F. Supp. 2d at 427.  We affirmed the preliminary injunction, finding that the district court did not abuse its discretion, and acknowledging the "factual parallels between the activities described in *Good News Club* and the activities at issue in the present litigation." *Bronx Household II*, 331 F.3d at 354.  After the issuance of the preliminary injunction, Bronx Household applied for, and was granted, permission to use P.S. 15 in the Bronx for its Sunday "Christian worship service[s]." *Bronx Household III*, 492 F.3d at 94, 101 (Calabresi, J., concurring).

Bronx Household thereafter moved for summary judgment to convert the preliminary injunction into a permanent injunction, and the Board cross-moved for summary judgment.  During the pendency of the motions for summary judgment, the Board wrote to the district court

6

asking the court to adjudicate the issue under a revised SOP, numbered SOP § 5.11,[3] which was intended to replace the old standard. The Board advised that the new SOP § 5.11 had been "approved at the highest levels of the Department of Education" and that if Bronx Household were to reapply, its application would be rejected under the new SOP § 5.11. *Id.* at 95 n.2. The text of the new SOP § 5.11 prohibited use of school property for "religious worship services, or otherwise using a school as a house of worship."[4] The district court, after initially expressing doubt about its jurisdiction to rule on the constitutionality of a rule whose status was unclear and which had not been applied against Plaintiffs, nevertheless concluded that the question was justiciable and granted summary judgment in favor of Bronx Household, permanently enjoining the Board from enforcing the proposed SOP § 5.11. *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 400 F. Supp. 2d 581, 588, 601 (S.D.N.Y. 2005). The district court concluded that its decision was compelled by the Supreme Court's decision in *Good News Club.*

On appeal, a majority consisting of Judge Calabresi and me, over dissent by Judge Walker, vacated the permanent injunction, although we were divided as to the rationale for doing so. *Bronx Household III*, 492 F.3d at 91 (per curiam). Judge Calabresi would have reached the

---

[3]Before the revision of the standard was proposed, the old SOP § 5.9 was renumbered (without change in text) to § 5.11. To avoid confusion, in this opinion we use "SOP § 5.9" to refer to the standard utilized by the Board before revision of the text, and we use "SOP § 5.11" to refer to the new text quoted in footnote 4.

[4]SOP § 5.11 states:

> No permit shall be granted for the purpose of holding religious worship services, or otherwise using a school as a house of worship. Permits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this chapter on the same basis that they are granted to other clubs for students that are sponsored by outside organizations.

7

merits and would have ruled that the proposed SOP § 5.11 was a reasonable, viewpoint-neutral, content-based restriction. *Id.* at 100-06 (Calabresi, J., concurring). I concluded that litigation over the constitutionality of the proposed SOP § 5.11 was unripe for adjudication. *Id.* at 122-23 (Leval, J., concurring). This was because the proposed rule, although "approved at the highest levels," had not been promulgated by the Board, and Bronx Household had neither applied, nor been refused, under the new standard. *Id.* at 115, 122 n.8. Judge Walker wrote in dissent that he would have reached the merits and would have ruled that enforcement of the new SOP was barred by *Good News Club*, because in his view it constituted impermissible viewpoint discrimination. *Id.* at 123-24 (Walker, J., dissenting). We remanded the case to the district court for all purposes. *Id.* at 91 (per curiam).

In July 2007, shortly after our decision remanding the case, the Board adopted the proposed SOP and published it for the first time. Bronx Household applied to use P.S. 15 under the new rule, stating in its application that it planned to use the facilities for "Christian worship services," and the Board denied the application.[5] Both parties then moved for summary judgment. The district court again granted summary judgment in favor of Bronx Household and permanently enjoined the Board from enforcing SOP § 5.11 against Bronx Household, adopting

[5]Previously, the Board's rules, which it published on its website, included no reference to the new SOP § 5.11; a person telephoning the Board to inquire whether there was a rule that governed use of school facilities after hours by religious groups was told no rule was in effect. In short, at the time we last heard this case, the new rule had not been promulgated, applied, or even disclosed to the public, and was not applied to Bronx Household. This led me to conclude, for reasons I explained in my concurring opinion, *see* 492 F.3d at 110-23, that there was no ripe controversy before the court as to the constitutionality of SOP § 5.11.

Judges Walker and Calabresi have authorized me to say that upon reconsideration of the circumstances that obtained when the case was last before us, they are now far less confident that the case was in fact ripe for adjudication at that time. Now that the new SOP has been adopted, published, and applied against Bronx Household, the controversy is unquestionably ripe for adjudication.

the reasoning of its previous opinion. *Bronx Household of Faith v. Bd. of Educ. City of New York*, No. 01 Civ. 8598 (S.D.N.Y. Nov. 1, 2007) (Preska, *J.*).

The case is now before us for the fourth time.

**DISCUSSION**

P.S. 15 is a limited public forum. *See Bronx Household III*, 492 F.3d at 97-98 (Calabresi, J., concurring); *id.* at 125 (Walker, J., dissenting); *Bronx Household I*, 127 F.3d at 211-14. As explained in Judge Calabresi's opinion in *Bronx Household III*, a category of speakers or expressive activities may be excluded from a limited public forum only on the basis of "reasonable, viewpoint-neutral rules." *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626 (2d Cir. 2005). Thus, the operator of a limited public forum may engage in "content discrimination, which may be permissible if it preserves the purposes of that limited forum," but may not engage in "viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995); *see also Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2984 (2010); *Good News Club*, 533 U.S. at 106-07.

SOP § 5.11, on its face, prohibits use of school facilities for two types of activities. The rule prohibits use of schools for "religious worship services," and prohibits also "otherwise using a school as a house of worship." Bronx Household stated in its application that it sought a permit to use P.S. 15 for "Christian worship services." While the Board did not explain its rejection of the application, it is clear that an application to use the school for "Christian worship services" falls under the words of SOP § 5.11 prohibiting use for "religious worship services." We therefore assume the Board relied, at least in part, on this clause of its rule in rejecting the application. (Accordingly, we need not, and this opinion does not, consider whether the Board

9

could lawfully exclude Bronx Household under the second, less precise, branch of the rule proscribing use of a school "as a house of worship.")[6]

A.

The prohibition against using school facilities for the conduct of religious worship services bars a type of activity. It does not discriminate against any point of view. The conduct of religious worship services, which the rule excludes, is something quite different from free expression of a religious point of view, which the Board does not prohibit. The conduct of services is the performance of an event or activity. While the conduct of religious services undoubtedly *includes* expressions of a religious point of view, it is not the expression of that point of view that is prohibited by the rule. Prayer, religious instruction, expression of devotion to God, and the singing of hymns, whether done by a person or a group, do not constitute the conduct of worship services. Those activities are not excluded. Indeed SOP § 5.11 expressly specifies that permits will be granted to student religious clubs "on the same basis that they are granted to other clubs for students." The branch of the rule excluding religious worship services, as we understand it, is designed by the Board to permit use of the school facilities for all of the types of activities considered by the Supreme Court in *Good News Club*, *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993), and *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 830 (1995). The "religious worship

[6]Nor does this opinion express any views as to whether "worship" may be lawfully excluded. Judge Walker criticizes this opinion for "declining even to consider" the constitutionality of the second branch of SOP § 5.11, which prohibits "using a school as a house of a worship." Dissenting Op. 3. Because this opinion concludes that the Board's rejection of Bronx Household's application was lawful under the "religious worship services" branch of the rule, further inquiry into the whether the Board could also lawfully exclude Bronx Household under the "house of worship" branch of the rule is unnecessary to this ruling.

10

services" clause does not purport to prohibit use of the facility by a person or group of persons for "worship." What is prohibited by this clause is solely the conduct of a particular type of event: a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion. The conduct of a "religious worship service" has the effect of placing centrally, and perhaps even of establishing, the religion in the school.[7]

There is an important difference between excluding the *conduct of an event or activity* that includes expression of a point of view, and excluding the *expression* of that point of view. Under rules consistent with the purposes of the forum, schools may exclude from their facilities all sorts of activities, such as martial arts matches, livestock shows, and horseback riding, even

---

[7]Judge Walker complains that our understanding of the meaning of the term "religious worship services" is "self-styled." Dissenting Op. 8. We have not found in any dictionary a definition of the compound term "religious worship services." Dictionaries define the verb to worship as "to honor or reverence as a divine being or supernatural power: VENERATE." *Webster's Third New International Dictionary* 2637 (1976); *see also Oxford English Dictionary* (Nov. 2010 online ed.), http://www.oed.com. (same). Worship, the noun, is defined as "an act, process, or instance of expressing such veneration by performing or taking part in religious exercises or ritual," and "a form or type of worship or religious practice with its creed or ritual." *Webster's Third New International Dictionary* 2637. The word service is defined as "[w]orship; esp. public worship according to form and order," "[a] ritual or series of words and ceremonies prescribed for public worship," *Oxford English Dictionary* (Nov. 2010 online ed.), and "the performance of religious worship esp. according to settled public forms or conventions," *Webster's Third New International Dictionary* 2075.

We believe the understanding we have put forth comports with common understanding and find nothing in dictionary definitions of the term's three component words that is inconsistent with our understanding. Nor does Judge Walker offer a better definition, whether derived from a dictionary or another source.

Furthermore, we do not understand why Judge Walker should concern himself with what we take SOP § 5.11 to mean by "religious worship services." According to his argument, no matter what SOP § 5.11 means by "religious worship services," it necessarily constitutes unlawful viewpoint discrimination because it excludes activity on the basis of the activity's religious nature. If Judge Walker is right as to the applicable test, SOP § 5.11 is void no matter what it means by "religious worship services."

11

though, by participating in and viewing such events, participants and spectators may express their love of them. The basis for the lawful exclusion of such activities is not viewpoint discrimination, but rather the objective of avoiding either harm to persons or property, or liability, or a mess, which those activities may produce. We think it beyond dispute that a school's decision to exclude martial arts matches would be lawful notwithstanding the honest claim of would-be participants that, through participating in the matches, they express their love of the sport and their character. The exclusion would nonetheless not represent viewpoint discrimination. While a school may prohibit the use of its facilities for such activities for valid reasons, it may not selectively exclude meetings that would celebrate martial arts, cow breeding, or horseback riding, because that would be viewpoint discrimination. When there exists a reasonable basis for excluding a type of activity or event in order to preserve the purposes of the forum, such content-based exclusion survives First Amendment challenge notwithstanding that participants might use the event to express their celebration of the activity. *See Rosenberger*, 515 U.S. at 829-30.

Similarly, SOP § 5.11 prohibits use of school facilities to conduct worship services, but does not exclude religious groups from using schools for prayer, singing hymns, religious instruction, expression of religious devotion, or the discussion of issues from a religious point of view. While it is true without question that religious worship services *include* such expressions of points of view, the fact that a reasonably excluded activity includes expressions of viewpoints does not render the exclusion of the activity unconstitutional if adherents are free to use the school facilities for expression of those viewpoints in all ways except through the reasonably excluded activity. Under at least this branch of SOP § 5.11, the schools are freely available for use by groups to express religious devotion through prayer, singing of hymns, preaching, and

12

teaching of scripture or doctrine. It is only the performance of a worship service that is excluded.

Nor is this rule of exclusion vulnerable on the ground that the activity excluded has some similarities to another activity that is allowed. To begin with, we reject the suggestion that because a religious worship service shares some features with activities such as a Boy Scout meeting, no meaningful distinction can be drawn between the two types of activities. *See* Dissenting Op. 11-12. Boy Scout meetings are not religious worship services. The fact that religion often encompasses concern for standards of conduct in human relations does not mean that all activity which expresses concern for standards of conduct in human relations must be deemed religion.

The argument might be made that, because the rule prohibits use of facilities for "*religious* worship services," it excludes religious worship services while permitting non-religious worship services. This argument is a canard. The presence of the word "religious" in the phrase is superfluous and does not change the meaning. There is no difference in usage between a "worship service" and a "religious worship service;" both refer to a service of religious worship. *See Bronx Household I*, 127 F.3d at 221 (Cabranes, J., concurring in part and dissenting in part) ("Unlike religious 'instruction,' there is no real secular analogue to religious 'services,' such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism."). We think, with confidence, that if 100 randomly selected people were polled as to whether they attend "worship services," all of them would understand the questioner to be inquiring whether they attended services of *religious* worship. While it is true that the word "worship" is occasionally used in nonreligious contexts, such as to describe a miser, who is said to "worship" money, or a fan who "worships" a movie

13

star,[8] the term "worship services" has no similar use; meetings of a celebrity's fan club are not described as "worship services." Worship services are religious; the rule describes the entire category of activity excluded. The meaning of the rule's exclusion of "religious worship services" would be no different if it identified the excluded activity as "worship services."

The application of SOP § 5.11 to deny Bronx Household's request to use school facilities for worship services is thus in no way incompatible with the Supreme Court's decisions in *Good News Club*, *Lamb's Chapel*, and *Rosenberger*. In *Good News Club*, a school district had invoked a policy prohibiting after-hours use of a school for "religious purposes" to deny a Christian organization permission to use space in a school building for "religious instruction" of children aged 6 to 12. 533 U.S. at 103-04. The Supreme Court ruled that this exclusion violated the Free Speech Clause. *Id.* at 120. The denial constituted viewpoint discrimination, rather than content-based restriction, because the school district refused to allow the teaching of moral lessons from a religious perspective, while permitting the teaching of moral lessons from a secular perspective. *Id.* at 107-08.

Similarly, in *Lamb's Chapel*, the Court found unconstitutional a school district's rejection of a church's request to show a Christian film series about child rearing and family values, again on the basis of a policy prohibiting after-hours use of school property "for religious purposes." *Lamb's Chapel*, 508 U.S. at 387-89, 393. Like the moral lessons taught in the Good News Club, the film series "dealt with a subject otherwise permissible . . . [but] its exhibition

---

[8]In the view of the author, such uses of the word are metaphorical. A statement that someone worships money or worships a movie star is intended to be understood as an assertion that the subject treats money or the movie star with the same devotion or reverence that a religious believer accords to God. (Judge Calabresi leaves open the question whether such statements are purely metaphorical or whether they too describe a form of worship. *See* Concurring Op. 1.)

14

was denied solely because the series dealt with the subject from a religious standpoint." *Id.* at 394. And in *Rosenberger*, the Court concluded that the University of Virginia discriminated on the basis of viewpoint, when, in accordance with its policy, it refused to reimburse the printing expenses of a student newspaper with a Christian editorial perspective because the publication "promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." *Rosenberger*, 515 U.S. at 827, 831-32. Because the University's refusal resulted from the newspaper's "prohibited perspective, not the general subject matter," it violated the Free Speech Clause. *Id.* at 831.

In each of those cases, the policy being enforced categorically excluded expressions of religious content. Here, by contrast, there is no restraint on the free expression of any point of view. Expression of all points of view is permitted. The exclusion applies only to the conduct of a certain type of activity – the conduct of worship services – and not to the free expression of religious views associated with it. It is clear that the Board changed its rule in order to conform to the dictates of *Good News Club*, abandoning the prohibition of "religious instruction" (which involved viewpoint discrimination). Indeed, SOP § 5.11 expressly permits use of school facilities by "religious clubs for students that are sponsored by outside organizations" on the same basis as other clubs for students sponsored by outside organizations.

Accordingly, as SOP § 5.11's prohibition of "religious worship services" does not constitute viewpoint discrimination, it is a content-based exclusion, which passes constitutional muster so long as the exclusion is reasonable in light of the purposes of the forum.

15

B.

We therefore go on to consider whether this exclusion is "reasonable in light of the purpose served by the forum." *Rosenberger*, 515 U.S. at 829 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Precedent, furthermore, calls for giving "appropriate regard" to the Board's judgment as to which activities are compatible with its reasons for opening schools to public use. *Christian Legal Soc'y*, 130 S. Ct. at 2989. By excluding religious worship services, the Board seeks to steer clear of violating the Establishment Clause. *See Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761-62 (1995) ("There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech."); *Widmar v. Vincent*, 454 U.S. 263, 271 (1981) (noting that an interest in avoiding a violation of the Establishment Clause "may be characterized as compelling"). In order to determine whether the content restriction for this purpose is reasonable and thus permissible, we need not decide whether use of the school for worship services would in fact violate the Establishment Clause, a question as to which reasonable arguments could be made either way, and on which no determinative ruling exists. It is sufficient if the Board has a strong basis for concern that permitting use of a public school for the conduct of religious worship services would violate the Establishment Clause. *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 476 (2d Cir. 1999) ("[W]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause . . . ."); *cf. Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (2009) (race-based employment action violates Title VII unless the employer has a strong basis to believe it otherwise will be subject to disparate impact liability). We

16

conclude that the Board has a strong basis to believe that allowing the conduct of religious worship services in schools would give rise to a sufficient appearance of endorsement to constitute a violation of the Establishment Clause.

The Supreme Court's decision in *Lemon v. Kurtzmann*, 403 U.S. 602 (1971), provides the framework for evaluating challenges under the Establishment Clause.[9] The Court instructed in *Lemon* that government action which interacts with religion (1) "must have a secular . . . purpose," (2) must have a "principal or primary effect . . . that neither advances nor inhibits religion," and (3) "must not foster an excessive government entanglement with religion." *Id.* at 612-13 (internal quotation marks omitted). In discussing the second prong of the *Lemon* test, the Supreme Court has warned that violation of the Establishment Clause can result from *perception* of endorsement. "The Establishment Clause, at the very least, prohibits government from *appearing* to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Cnty. of Allegheny*, 492 U.S 573, 593-94 (1989) (emphasis added) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (O'Connor, J., concurring)); *see also Lynch*, 465 U.S. at 690 (O'Connor, J., concurring) (observing that the second prong of the *Lemon* test "asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval"); *Skoros*, 437 F.3d at 17-18. It was certainly not unreasonable for the Board to conclude that permitting the conduct of religious worship services in the schools might fail the

___

[9]Although the *Lemon* test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit. *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 634 (2d Cir. 2005); *see Skoros v. City of New York*, 437 F.3d 1, 17 n.13 (2d Cir. 2006) (noting that this Court is required to respect precedent applying the *Lemon* test "until it is reconsidered by this court sitting *en banc* or is rejected by a later Supreme Court decision").

17

second and third prongs of the *Lemon* test, and that the adoption of the "worship services" branch of SOP § 5.11 was a reasonable means of avoiding a violation of the Establishment Clause.

The performance of worship services is a core event in organized religion. *See Bronx Household*, 226 F. Supp. 2d at 410 (quoting Pastor Hall describing Bronx Household's Sunday worship service as "the indispensable integration point for our church"); Mark Chaves, *Congregations in America* 227 (2004) (reporting results of survey finding that 99.3% of religious congregations hold services at least once per week). Religious worship services are conducted according to the rules dictated by the particular religious establishment and are generally performed by an officiant of the church or religion. When worship services are performed in a place, the nature of the site changes. The site is no longer simply a room in a school being used temporarily for some activity. The church has made the school the place for the performance of its rites, and might well appear to have *established* itself there. The place has, at least for a time, become the church.

Moreover, the Board's concern that it would be substantially subsidizing churches if it opened schools for religious worship services is reasonable. The Board neither charges rent for use of its space, nor exacts a fee to cover utilities such as electricity, gas, and air conditioning.[10] The City thus foots a major portion of the costs of the operation of a church. It is reasonable for the Board to fear that allowing schools to be converted into churches, at public expense and in public buildings, might "foster an excessive government entanglement with religion" that advances religion. *See DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 419 (2d Cir.

[10]The only fee charged is for the partial cost of custodial work, and for security services when provided by the Board.

18

2001) (concluding that a publicly funded private hospital whose employees coerced patients to participate in a religious support group would violate the Establishment Clause, noting that the Supreme Court's "'decisions provide no precedent for the use of public funds to finance religious activities,'" and that "neutral administration of the state aid program . . . is an insufficient constitutional counterweight to the direct public funding of religious activities" (quoting *Mitchell v. Helms*, 530 U.S. 793, 840 (2000) (O'Connor, J., concurring in the judgment))).

The Board could also reasonably worry that the regular, long-term conversion of schools into state-subsidized churches on Sundays would violate the Establishment Clause by reason of public perception of endorsement. *Cf. Pleasant Grove City v. Summum*, 129 S. Ct. 1125, 1132 (2009) (ruling that monument in public park was properly viewed as government speech because, among other reasons, the monument was permanent). Such a concern has been vindicated by the experience in the schools in the seven years since the district court granted the preliminary injunction. For example, Bronx Household has held its worship services at P.S. 15, and nowhere else, every Sunday since 2002. Under the injunction, at least twenty-one other congregations have used a school building on Sundays as their regular place for worship services.[11] During these Sunday services, the schools are dominated by church use. *See Capitol Square*, 515 U.S. at 777 (O'Connor, J., concurring in part and concurring in the judgment) ("At some point . . . a private religious group may so dominate a public forum that a formal policy of equal access is transformed into a demonstration of approval."). Because of their large

---

[11]The record in this regard has not been updated since 2005. At oral argument, counsel for the Board told us that the number of churches using schools for worship services has increased substantially since that time.

congregations, churches generally use the largest room in the building, or multiple rooms, sometimes for the entire day. *See Cnty. of Allegheny*, 492 U.S. at 579, 599-600 (finding unconstitutional endorsement of religion where crèche was placed on the "Grand Staircase" of courthouse, the "main" and "most public" part of the building, which was not available to other displays simultaneously). Church members post signs, distribute flyers, and proselytize outside the school buildings. In some schools, no other outside organizations use the space. Accordingly, on Sundays, some schools effectively become churches. As a result of this church domination of the space, both church congregants and members of the public identify the churches with the schools. The possibility of perceived endorsement is made particularly acute by the fact that P.S. 15 and other schools used by churches are attended by young and impressionable students, who might easily mistake the consequences of a neutral policy for endorsement. *Cf. Van Orden v. Perry*, 545 U.S. 677, 703 (2005) (Breyer, J., concurring) (distinguishing lawful display of Ten Commandments from cases in which display was "on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state"); *Skoros*, 437 F.3d at 24-25 ("A mature reasonable objective observer . . . would take into consideration that schoolchildren are the intended audience for the displays, that these children are being reared in a variety of faiths (as well as none), and that, by virtue of their ages, they may be especially susceptible to any religious messages conveyed by such displays.").[12]

_____

[12]The dissent maintains that *Good News Club* precludes the Board from relying on this concern, because the facts of this case present less reason to fear the appearance of endorsement than those of *Good News Club*. Dissenting Op. 22-23. We disagree with this assessment of the facts. In our view, Bronx Household's long-term weekly use of P.S. 15 for Christian worship services at the Board's expense, and the effective exclusion of competing religious groups who would wish to hold services in schools on days other than Sunday but are effectively precluded

20

Furthermore, the fact that school facilities are principally available for public use on Sundays results in an unintended bias in favor of Christian religions, which prescribe Sunday as the principal day for worship services. Jews and Muslims generally cannot use school facilities for their services because the facilities are often unavailable on the days that their religions principally prescribe for services. At least one request to hold Jewish services (in a school building used for Christian services on Sundays) was denied because the building was unavailable on Saturdays. This contributes to a perception of public schools as Christian churches, but not synagogues or mosques.

Finally, the religious services Bronx Household conducts in the school are not open on uniform terms to the general public. Bronx Household acknowledges that it excludes persons not baptized, as well as persons who have been excommunicated or who advocate the Islamic religion, from full participation in its services. *See Bronx Household III*, 492 F.3d at 120 (Leval, J., concurring); *cf. Christian Legal Soc'y*, 130 S. Ct. at 2995 (upholding university's denial of Registered Student Organization status to student group that refused to comply with non-discrimination policy for ideological reasons). The *de facto* favoritism of the Christian (Sunday service) religions over others, as well as the deliberate exclusion practiced by Bronx Household, aggravates the potential Establishment Clause problems the Board seeks to avoid.

In the end, we think the Board could have reasonably concluded that what the public would see, were the Board not to exclude religious worship services, is public schools, which serve on Sundays as state-sponsored Christian churches. For these reasons, the Board had a

by school-related activities from doing so, provides a substantially stronger basis for fearing an Establishment Clause violation than the after-school use of a single classroom by a religious group at issue in *Good News Club*.

21

strong basis to be wary that permitting religious worship services in schools, and thus effectively allowing schools to be converted into churches on Sunday, would be found to violate the Establishment Clause. To reiterate, we do not say that a violation has occurred, or would occur but for the policy. We do find, however, that it was objectively reasonable for the Board to worry that use of the City's schools for religious worship services, conducted primarily on Sunday when the schools are most available to outside groups, exposes the City to a substantial risk of being found to have violated the Establishment Clause.

This conclusion is not, as the dissent maintains, foreclosed by the Supreme Court's precedents. We recognize that in *Good News Club*, *Widmar*, *Lamb's Chapel*, and *Rosenberger*, the Supreme Court rejected arguments that the rules in question, and their application to bar or disfavor particular activities, were justified by concern to avoid violating the Establishment Clause. But those rulings were based on their particular facts, which are significantly different from those here. In none of those cases did the Supreme Court suggest that a reasonable concern to avoid violation of the Establishment Clause can *never* justify a governmental exclusion of a religious practice. In arguing that the Supreme Court's precedents forbid our ruling, the dissent relies on broad statements of principle, often from opinions that did not command a majority of the Court, and contends that, taken together, they show the invalidity of the reasons the Board proffers for fearing an Establishment Clause violation. However, neither the Supreme Court nor this court has considered the constitutionality of a policy that allows the regular use of public schools for religious worship services. Indeed, the Court in *Good News Club* expressly declined to address the lawfulness of a policy that excludes "mere" religious worship, a category of activity which is substantially broader than the "religious worship services" covered by the first branch of SOP § 5.11. *Good News Club*, 533 U.S. at 112 n.4.

22

In any event, the reasonableness of the Board's concern to avoid creating a perception of endorsement resulting from regular Sunday conversion of schools into Christian churches, together with the absence of viewpoint-based discrimination, distinguishes this case from the Supreme Court's precedents striking down prohibitions of the use of educational facilities or funds by religious groups. All of those cases involved rules or policies which broadly suppressed religious viewpoints and which, in their particular applications, disfavored activities which had far less potential to convey the appearance of official endorsement of religion. In *Widmar*, the challenged policy prohibited the use of university facilities for religious worship or even discussion. In *Rosenberger*, the challenged policy prohibited the reimbursement of expenses incurred by university student groups for activities that "primarily promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. at 825. And in *Lamb's Chapel* and *Good News Club*, the challenged policies prohibited the use of school district property for any and all "religious purposes." *See Good News Club*, 533 U.S. at 103; *Lamb's Chapel*, 508 U.S. 387. In each case, the policy being enforced, unlike SOP § 5.11, was broadly categorical in its exclusion of religious content. In addition, the activities disallowed or disfavored under those policies – meetings of Christian clubs for students (in *Widmar* and *Good News Club*), the publication of a newspaper with a Christian editorial viewpoint (in *Rosenberger*), and the showing of a Christian film series (in *Lamb's Chapel*) – were much less likely than the conduct of Sunday worship services to evoke an appearance of endorsement of religion by public school authorities. In determining that there was no danger of an Establishment Clause violation in these cases, the Supreme Court relied on the fact that facilities and funds were available to and used by numerous and diverse private groups. *See Lamb's Chapel*, 508 U.S. at 395 (observing that school district's property "had repeatedly been used by a

wide variety of private organizations"); *Rosenberger*, 515 U.S. at 842 (student activity funds were distributed to "a wide spectrum of student groups"); *Widmar*, 454 U.S. at 277 (university provided benefits to "over 100 student groups of all types"); *Good News Club*, 533 U.S. at 113 (district "made its forum available to other organizations"). In finding insufficient risk of the perception of endorsement, the Court observed in *Widmar* that university students are "young adults," who are "less impressionable than younger students" and can therefore appreciate that a policy permitting religious student groups to use meeting space on the same basis as other types of student groups was neutral toward religion. 454 U.S. at 275-75 & n.14. And in *Lamb's Chapel* and *Good News Club*, the Court found it significant that the proposed film exhibition and club meetings would be open to the public, not just to the members of the Christian groups sponsoring the events. *See Good News Club*, 533 U.S. at 113; *Lamb's Chapel*, 508 U.S. at 395.

The use of P.S. 15 and other schools for Sunday worship services is more likely to promote a perception of endorsement than the uses in those cases. A worship service is an act of organized religion that consecrates the place in which it is performed, making it a church. Unlike the groups seeking access in those cases, Bronx Household and the other churches that have been allowed access under the injunction tend to dominate the schools on the day they use them. They do not use a single, small classroom, and are not merely one of various types of groups using the schools; they use the largest rooms and are typically the only outside group using a school on Sunday. They identify the schools as their churches, as do many residents of the community. The students of P.S. 15 are not the "young adults" of *Rosenberger* and *Widmar*, but young children who are less likely to understand that the church in their school is not endorsed by their school. The fact that New York City's school facilities are more available on Sundays than any other day of the week means that there is a *de facto* bias in favor of Christian

24

groups who want to use the schools for worship services, compounded by the exclusionary practices of churches like Bronx Household.

Furthermore, the Board's prohibition on the use of school facilities for "religious worship services" is far less broad than the exclusions of use for "religious purposes" or "religious discussion" in the earlier cases, which included in their sweep activities that are similar to secular activities. The broad scope of the exclusions considered in the other cases resulted in viewpoint discrimination, rather than mere content restriction. The exclusions also disfavored more religious activity than necessary to avoid an actual Establishment Clause violation. In contrast, the "religious worship services" clause of SOP § 5.11 is narrowly drawn to exclude a core activity in the establishment of religion – worship services – and thereby avoid the perceived transformation of school buildings into churches.

It is not our contention that the Supreme Court's precedents compel our conclusion. On the other hand, we cannot accept Judge Walker's contention that the Court has effectively decided this case. This case is terra incognita. The Supreme Court's precedents provide no secure guidelines as to how it should be decided. The main lesson that can be derived from them is that they do not supply an answer to the case before us. Precedent provides no way of guessing how the Supreme Court will rule when it comes to consider facts comparable to these. By hunting and pecking through the dicta of various opinions, one can find snippets that arguably support a prediction either way. Judge Calabresi and I believe that the Board's exclusion of Bronx Household's conduct of worship services is viewpoint-neutral and justified by the Board's reasonable concern that permitting use of school facilities for worship services would violate the Establishment Clause.

* * *

Bronx Household contends that SOP § 5.11 is not a measure reasonably designed to avoid an Establishment Clause violation but is instead itself a violation of that clause. Bronx Household argues that SOP § 5.11 fails the *Lemon* test because it sends a message of official hostility to religion and because its enforcement fosters excessive government entanglement with religion. We are not persuaded.

As emphasized above, SOP § 5.11 prohibits worship services in schools, but permits the expression of religious points of view through activities such as prayer, singing of hymns, preaching, and teaching or discussion of doctrine or scripture. Given the broad range of expressive religious activity that the policy does allow, we do not think a reasonable observer would perceive hostility to religion in the enforcement of SOP § 5.11.

Bronx Household also argues that SOP § 5.11 not only conveys the appearance of official hostility, but is in fact motivated by such hostility. We find no basis for this contention. Of course, "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. However, we do not understand why Bronx Household attributes the Board's position to hostility rather than a good faith desire to navigate successfully through the poorly marked, and rapidly changing, channel between the Scylla of viewpoint discrimination and the Charybdis of violation of the Establishment Clause.

The Board has by no means been alone in the belief that the Establishment Clause requires governmental educational institutions to be cautious of harboring or sponsoring religious activities. The Supreme Court's rulings in *Rosenberger*, *Lamb's Chapel*, and *Good News Club* deviated from a previously widespread governmental and judicial perception of the scope of the Establishment Clause's prohibitions. In each of those three cases, the school

26

administrators and the lower court judges believed that the challenged policies, which were intended to keep religion at a distance from public institutions, were mandated by the Establishment Clause, or at least consistent with the Constitution. And in two of the cases, a number of Supreme Court justices did as well.

There is no better reason to believe, as Bronx Household suggests, that the Board was motivated by hostility toward religion than there is to believe that such hostility has motivated other school authorities throughout the country, the lower court judges and dissenting Supreme Court justices in *Lamb's Chapel*, *Rosenberger*, and *Good News Club*, or Judge Calabresi and me. We see no sound basis for concluding that the Board's actions have been motivated by anything other than a desire to find the proper balance between two clauses of the First Amendment, the interpretation of which by the Supreme Court has been in flux and uncertain.[13]

Bronx Household also argues that SOP § 5.11 cannot be applied without unconstitutionally entangling the Board in matters of religious doctrine. *See Agostini v. Felton*, 521 U.S. 203, 232-33 (1997). According to Bronx Household, any attempt by the Board to distinguish between religious activity that falls under the exclusion of "worship services," and religious activity that does not, necessarily places the Board in violation of the duty imposed by *Lemon* to avoid "excessive government entanglement with religion." 403 U.S. at 613.[14]

---

[13]Judge Walker similarly asserted in his dissent in *Bronx Household III* that the Board's adoption of SOP § 5.11 was motivated by "long-standing hostility to religious groups." *See Bronx Household III*, 492 F.3d at 127 ("The Board's avowed purposed in enforcing the regulation in this case . . . and its long-standing hostility to religious groups, leads ineluctably to the conclusion that the Board, in fact, has undertaken to exclude a particular viewpoint from its property."). Judge Walker has not repeated that assertion in his present opinion, but neither has he retracted it.

[14]Judge Walker has also made this argument. *See Bronx Household III*, 492 F.3d at 131 (Walker, J., dissenting) (arguing that the Board would "flout[] the Establishment Clause" by trying to distinguish worship because it would "no doubt have to interpret religious doctrine or

27

To begin with, whatever merit this argument may have in other types of cases, we do not see what application it has here. Bronx Household does not contest that it conducts religious worship services. To the contrary, it applied for a permit to conduct "Christian worship services," and the evidence suggests no reason to question its own characterization of its activities. *Cf. Christian Legal Soc'y*, 130 S. Ct. at 2982-84; *Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 918 & n.18 (9th Cir. 2007), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008).

This argument, furthermore, overlooks the nature of the duties placed on government officials by the Establishment Clause (as well as the Free Exercise of Religion Clause). As we outlined above, while other clauses of the First Amendment prohibit government officials from discriminating on the basis of religious viewpoint, the Establishment Clause prohibits them from taking action that would constitute establishment of religion. In various circumstances, especially when dealing with initiatives for the conduct of undoubtedly religious exercises on public property, government officials cannot discharge their constitutional obligations without close examination of the particular conduct to determine if it is properly deemed to be religious and if so whether allowing it would constitute a prohibited establishment of religion. Bronx Household's argument, if valid, would effectively nullify the Establishment Clause.[15]

Without doubt there are circumstances where a government official's involvement in

_____

defer to the interpretations of religious officials in order to keep worship, and worship alone, out of its schools" (internal quotation marks omitted)).

[15]The Free Exercise of Religion Clause also at times compels government officials to examine conduct of an undoubtedly religious nature to determine whether it constitutes exercise of religion, and is thus entitled to the clause's protection, or does not, and is thus subject to regulation.

matters of religious doctrine constitutes excessive government entanglement. *See, e.g.*, *Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 427 (2d Cir. 2002). But it does not follow, as Bronx Household seems to argue, that the mere act of inspection of religious conduct is an excessive entanglement. The Constitution, far from forbidding government examination of assertedly religious conduct, at times *compels* government officials to undertake such inquiry in order to draw necessary distinctions.[16] *See Lee v. Weisman*, 505 U.S. 577, 598 (1992) ("Our jurisprudence in this area is of necessity one of line-drawing, of determining at what point a dissenter's rights of religious freedom are infringed by the State."); *Cnty. of Allegheny*, 492 U.S. at 630 (O'Connor, J., concurring in part and concurring in the judgment) ("We cannot avoid the obligation to draw lines, often close and difficult lines, in deciding Establishment Clause cases . . . ."). It was just such inspection which permitted the Supreme Court to allow the display of arguably religious symbols in certain public contexts while prohibiting it in others. *Compare Van Orden*, 545 U.S. at 703 (Breyer, J., concurring), *and Cnty. of Allegheny*, 492 U.S. at 620, *with McCreary*, 545 U.S. at 881, *and Cnty. of Allegheny*, 492 U.S. at 601-02.

C.

Judge Walker's dissenting opinion criticizes our ruling on a number of grounds. We believe his criticisms are not well founded.

1) Judge Walker's primary argument is that, because SOP § 5.11's exclusion of religious worship services depends on their religious nature, which we do not dispute, it necessarily

---

[16]Applying such a rule would, for example, mean that every claim of entitlement under the Religious Land Use and Institutionalized Persons Act (RLIUPA), 42 U.S.C. § 2000cc *et seq.*, would be immune from court inquiry into whether the use is in fact a religious use.

discriminates illegally on the basis of viewpoint. *See* Dissenting Op. 10 ("The Board cannot lawfully exclude the conduct of an event based solely on the religious viewpoints expressed during the event."). He concludes that there is "no doubt that it is 'religious services' and 'worship' that the Board is targeting for exclusion" because "[t]he Board is otherwise unconcerned with comparable ceremonial speech occurring on school premises." Dissenting Op. 9. According to his analysis, the governing test should be "whether Bronx Household is engaging in speech that fulfills the purposes of the forum and is consistent with non-religious speech occurring on school premises." Dissenting Op. 9. If Bronx Household is engaging in such speech and is excluded because of the religious nature of its activity, the exclusion is necessarily illegal viewpoint discrimination.

The problem we find with Judge Walker's analysis is that it either ignores the crucial role of the Establishment Clause in motivating the Board's decision or it simply reads that clause out of the Constitution. The general effect of the Establishment Clause is to prohibit government from taking actions which have the effect of establishing *religion*. Assuming that the Establishment Clause has some meaning – that is to say, assuming there are some forms of activity which government may not conduct (or may not permit) by reason of the Establishment Clause – any such prohibitions necessarily depend on the *religious* nature of the particular activity. If the activity is not of religious nature, it does not fall within the purview of the Establishment Clause.

This feature is evident throughout the Supreme Court's Establishment Clause jurisprudence. In *Lee v. Weisman*, 505 U.S. 577 (1992), for example, the Supreme Court held that the Establishment Clause prohibited a public high school from including the recitation of a prayer in its graduation ceremony. The prayer was unquestionably an expressive act, and the

30

prohibition by the Court under the Establishment Clause unquestionably depended on the religious nature of prayer. Had the school administration sought to include instead of a prayer a non-religious affirmation of patriotism, or of love of learning, that would not have been prohibited by the Establishment Clause.

In *County of Allegheny v. ACLU*, 492 U.S. 573 (1989), the Court held that the Establishment Clause prohibited the display of a crèche in the Grand Staircase of the Allegheny County Courthouse, but upheld against Establishment Clause challenge another display which included an 18-foot menorah, a 45-foot Christmas tree, and a sign declaring devotion to liberty. Both displays conveyed an expressive message. What distinguished them was the fact that the crèche "sent an unmistakable message that [the county] supports and promotes the Christian praise to God," *id.* at 600, while the menorah, tree, and sign celebrated the holiday season on a non-sectarian basis, *id.* at 617-18.

In the companion cases of *McCreary County v. ACLU*, 545 U.S. 844 (2005), and *Van Orden v. Perry*, 545 U.S. 677 (2005), the Court distinguished between two public displays of the Ten Commandments based on whether they conveyed a message of governmental support or endorsement of religion. In *McCreary*, the Court upheld an injunction prohibiting a display of the Ten Commandments in two courthouses, because the displays had a "predominantly religious purpose." *McCreary*, 545 U.S. at 881. By contrast, Justice Breyer's controlling opinion in *Van Orden* found that the display of the Ten Commandments in the Texas State Capitol did not violate the Establishment Clause because, when viewed in context, it conveyed a predominantly secular message of the importance of law. *Van Orden*, 545 U.S. at 701-02 (Breyer, J., concurring). The religious (or non-religious) nature of the two displays again determined whether their presence on public property was lawful.

31

In light of such decisions, Judge Walker's view of the question seems to us not compatible with the Establishment Clause. Inevitably, whatever expressive conduct is prohibited by the Establishment Clause is prohibited by reason of its religious nature and would not be prohibited if what it expressed were not related to religion.

We do not suggest for a moment that any and all expressive activity with religious content must be excluded from government property or from government-controlled enterprise, such as the administration of a school system. The Supreme Court has unquestionably ruled otherwise in *Rosenberger*, *Good News Club*, and other cases. Our point is only that the test cannot be as Judge Walker views it. The mere fact that government does not permit an expressive activity, which it would permit if the activity were not religious, does not compel the conclusion that it is engaging in unconstitutional viewpoint discrimination. Whatever forms of governmental action are prohibited by the Establishment Clause are prohibited in part because of their religious nature and would not be prohibited if they were not religious.

Where government excludes a category of activity involving religious expression out of concern for the limitations imposed on government by the Establishment Clause, the lawfulness of the exclusion (notwithstanding that the religious content motivates the exclusion) will turn on whether allowing the activity would either violate the Establishment Clause or place the government entity at a reasonably perceived risk of violating the Establishment Clause. The Supreme Court has never ruled on whether permitting the regular conduct of religious worship services in public schools constitutes a violation of the Establishment Clause, and we reach no conclusion on that question. As discussed above, considering all the circumstances, we think the risk that permitting the regular conduct of worship services in public schools would violate the Establishment Clause is sufficiently high to justify the Board's adoption of a content restriction

that prohibits the performance of such services but does not otherwise limit the expression of religious viewpoints.

2) Judge Walker maintains that our ruling approves the exclusion of the very sort of conduct that the Supreme Court ruled in *Good News Club* could not be excluded. Dissenting Op. 10. We respectfully disagree. The application of the Good News Club, which the school district denied, was for a Christian group to hold after-school meetings for children between the ages of six and twelve, where they would have "a fun time of singing songs, hearing a Bible lesson and memorizing scripture." *Good News Club*, 533 U.S. at 103. The club later gave an expanded description by letter to the effect that

> Ms. Fournier tak[es] attendance. As she calls a child's name, if the child recites a Bible verse the child receives a treat. After attendance, the Club sings songs. Next Club members engage in games that involve, *inter alia*, learning Bible verses. Ms. Fournier then relates a Bible story and explains how it applies to Club members' lives. The Club closes with prayer. Finally, Ms. Fournier distributes treats and the Bible verses for memorization.

*Id.*

Without doubt there is some overlap between Bronx Household's conduct of Christian worship services and the children's club meetings that were the subject of *Good News Club*, in that worship services generally include song, prayer, and scripture. Nonetheless, we doubt that objective observers employing ordinary understandings of the English language would describe Ms. Fournier's club meetings as worship services. Judge Walker seeks to discern the meaning of the Supreme Court's majority opinion from the emphatic objections to it expressed in Justice Souter's dissenting opinion. He bases his assertion that the activities of the Good News Club were "religious worship services" on Justice Souter's dissenting statement that what the majority allowed into a public school was in effect "an evangelical service of worship." 533 U.S. at 138.

33

It is axiomatic that a dissenting opinion is generally the least reliable place to look to discern the meaning of a majority opinion. Dissenters commonly exaggerate what they see as inevitable, appalling consequences of the majority's ruling, a phenomenon which led Judge Friendly to observe that dissenting opinions are "rarely a safe guide to the holding of the majority." *United States v. Gorman*, 355 F.2d 151, 155 (2d Cir. 1965). Regardless of whether the dissenting justices believed the activities of the Good News Club were equivalent to "an evangelical service of worship," there is no indication that the majority shared that view. Indeed, rejecting the argument advanced by the school district in *Good News Club* "that the Club's activities constitute 'religious worship,'" the majority expressly noted that the court below had "made no such determination," emphasizing that it was not addressing what ruling it would make if the excluded activity were religious worship. *Id.* at 112 n.4.

We do not mean to imply that we think the Supreme Court somehow indicated in *Good News Club* that it would rule as we do on the exclusion of worship services. Our point is only that the Supreme Court has neither ruled on the question, nor even given any reliable indication of how it would rule.

3) Judge Walker argues that we err to the extent that we rely on the heavy predominance of the use of schools for *Christian* worship services (as opposed to services of other religions) because of the greater availability of the schools on the Christian day of worship. He argues that the greater availability of schools for use by Christian organizations is of no constitutional concern, because "[a]n Establishment Clause violation does not result from either private choice or happenstance." Dissenting Op. 24.

The greater availability of schools for use on the Christian day of worship is certainly not "happenstance." From the first, schools throughout the United States were closed on Sundays

34

precisely because Sunday is the Christian day of worship – the day when schoolchildren were expected to attend church services with their parents.  The tradition of closing schools, post offices, courts, and other government buildings on Sunday is no more happenstance than the fact that, until recently, many state laws required businesses to close on Sundays.  *See* Alan Raucher, *Sunday Business and the Decline of Sunday Closing Laws: A Historical Overview*, 36 J. Church and State 13 (1994).  That choice has origins in the government's solicitude for Christianity, in what was once widely viewed as "a Christian nation."  *Holy Trinity Church v. United States*, 143 U.S. 457, 471 (1892).

                                                                *   *   *

In rejecting a multitude of Judge Walker's arguments, we do not imply that his conclusion (as to the constitutional invalidity of the religious worship services branch of SOP § 5.11) is frivolous or even necessarily wrong.  The Supreme Court's rulings have laid down no principles that compel a decision one way or the other on these facts.  Nor has the Supreme Court given any reliable indication of how it will rule if and when it confronts these facts.  As Judge Calabresi and I view the facts, the use of New York City public schools for religious worship services – with a heavy predominance of Christian worship services because school buildings are most available for non-school use on Sundays – would create a very substantial appearance of governmental endorsement of religion and give the Board a strong basis to fear that permitting such use would violate the Establishment Clause.  Because the "religious worship services" clause of SOP § 5.11 is a content restriction that excludes only a type of activity, does so for a reason that is either constitutionally mandated or at least constitutionally reasonable, and does not otherwise curtail free expression of religious viewpoints, we conclude that the restriction does not violate the Constitution.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED, and the injunction barring enforcement of SOP § 5.11 against Bronx Household is VACATED.

CALABRESI, Circuit Judge, concurring:

I join Judge Leval's opinion in full because it states a correct alternative ground upon which to decide this case. But I write separately to emphasize that I continue to adhere to the position I took in my earlier opinion in this case, that worship is *sui generis*. *See Bronx Household III*, 492 F.3d at 100 (Calabresi, J., concurring). And I especially wish to reaffirm my view there stated:

> A holding that *worship* is only an agglomeration of rites would be a judicial finding on the nature of worship that would not only be grievously wrong, but also deeply insulting to persons of faith.

*Id.* at 103. Worship is something entirely different. *See id.*; *see also Bronx Household I*, 127 F.3d at 221 (Cabranes, J., concurring in part and dissenting in part) ("Unlike religious 'instruction,' there is no real secular analogue to religious 'services,' such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism."). State rules excluding all "worship" from a limited public forum, therefore, are based on content, not viewpoint.

In the context of the rule before us, there is one particular problem: the rule seems to prohibit *religious* worship. *See* SOP § 5.11 ("No permit shall be granted for the purpose of holding religious worship services . . . ."). And if it be the case that *non-religious* worship also exists, then the prohibition of *religious* worship would be viewpoint discrimination, and most likely unconstitutional. The question of whether there is a category of nonreligious worship, or whether worship is inherently religious and thus "religious worship" is redundant, is interesting and difficult, but we do not need to decide it in this case. The majority opinion does not need to decide the issue because it concludes that there is no such thing as a non-religious worship *service*. Maj. Op. at **[15-**

1

**16**]. I also need not decide the issue because the rule before us prohibits "using a school as a house of worship," as well as the holding of "religious worship services." SOP § 5.11. No one questions that what Appellees seek to do in the instant case is to use the school as a house of worship. And since both religious worship and nonreligious worship (if there be any) are subject to the clause barring use of a school as "a house of worship," the prohibition here is content- and not viewpoint-based.

We also do not need to be concerned with whether in some other case it might be hard to say whether what the Appellees wish to do is to use the school as "a house of worship." Nor need we worry that, in attempting to answer that question, we (or the Appellants) might become unconstitutionally "entangle[d] with religion," *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971). For Appellees admitted in their permit request, *see* J.A. at 3586, and in their briefs before this court, *see* Appellees' Br. at 1, that they seek to use school facilities for "worship." When a group tells the government that what it wishes to do is "worship," the government is entitled to take the group at its word. *See Bronx Household I*, 127 F.3d at 221-22 (Cabranes, J., concurring in part and dissenting in part) ("There may be cases in which the parties dispute whether or not a proposed activity for which permission to use school premises is denied actually constitutes religious instruction or worship . . . . However, this issue does not arise in the instant case, as the parties have stipulated that plaintiff seeks to use a school gymnasium for 'religious worship services.'"). That is all the Appellants did when they enforced SOP § 5.11,[1] and

---

[1] Whatever the Appellants may have done in deciding whether to grant previous permit applications not governed by the revised SOP § 5.11 is not before us. Under SOP § 5.11, the Appellants denied the Appellees' permit application four days after it was submitted, because it described the activities to be conducted on school premises as "Christian worship services." *See* J.A. at 3586, 3588. It also does not matter that the permit

it is all a court needs to do here.  This case does not, therefore, present an appropriate

occasion for deciding how to resolve a dispute over whether something actually is

"worship."

application included the words "as we have done in the past," J.A. at 3586, or that it
might have been worded explicitly to include, in addition to worship, other activities that,
if conducted separately from worship, could not constitutionally be excluded from the
limited public forum. Once an applicant says that what it wishes to do is "worship," no
inquiry into whether the underlying or accompanying activities actually constitute
worship is required.

JOHN M. WALKER, JR., <u>Circuit Judge</u>, dissenting:

The Board's Standard Operating Procedure ("SOP") § 5.11 withholds otherwise broadly available school-use permits from religious groups seeking to use school facilities during non-school hours "for the purpose of holding religious worship services, or otherwise using a school as a house of worship." Without addressing the "house of worship" ban, the majority concludes that the ban on "religious worship services" does not offend the First Amendment's Free Speech Clause because it is a neutral, content-based restriction that is reasonably implemented to avoid an Establishment Clause violation. I disagree: SOP § 5.11 is impermissible viewpoint discrimination against protected speech and is unsupported by a compelling state interest. In this case, Bronx Household's worship services fit easily within the purposes of the Board's broadly available forum and may not be the object of discrimination based upon the religious viewpoint expressed by the services' participants. The Board's purported Establishment Clause concerns are insubstantial: they are not reasonable, much less a compelling reason for the Board to shut the door on Bronx Household's protected speech.

* * * * *

When this panel split in 2007, Judge Calabresi indicated that he would uphold SOP § 5.11 as a reasonable content-based

-1-

restriction on the unique subject of "worship," Judge Leval expressed no opinion on the merits of the case due to ripeness concerns, and I indicated that I would strike down the application of SOP § 5.11 as unconstitutional viewpoint discrimination. See generally Bronx Household of Faith v. Bd. of Educ., 492 F.3d 89, 100-106 (Calabresi, J.), 110-123 (Leval, J.), and 123-32 (Walker, J.) (2d Cir. 2007). At that time, I compared the purpose of Bronx Household's proposed use of school property with the purposes for which the Board opened its limited forum to the public under SOP § 5.6.2, and, after inquiring searchingly of the government's motives, concluded that the Board had engaged in impermissible viewpoint discrimination by rejecting permit applicants under SOP § 5.11. Id. at 123-25. In response to Judge Calabresi's willingness to uphold the Board's prohibition on religious worship, I countered that Judge Calabresi had not engaged in any real analysis of the purpose of Bronx Household's proposed expressive activity in light of the purposes of the forum and in comparison to the purposes of the activities the Board had allowed, pointing out that he had erred by simply comparing the speech already permitted on school premises with "worship," which he declared to be sui generis and thus readily excludable from the forum. See id. at 127-130; cf. Op. of J. Calabresi at 1.

Now, in this latest iteration of what is effectively the

-2-

same facial challenge to the Board's exclusions under SOP § 5.11, the majority opinion breaks with Judge Calabresi's earlier analysis that "worship" is a separate category of speech that is readily excludable from the Board's expansive community use policy, declining even to consider either the second part of SOP § 5.11 (which prohibits "using a school as a house of worship") or whether "worship" may be lawfully excluded from the forum. Compare Maj. Op. at 11 & 11 n.6 (expressly avoiding a decision on "worship"), with Op. of J. Calabresi at 1-3 (readily excluding "worship").[1]  Rather, the majority adopts a position not argued below or advanced by the Board by focusing solely on the Board's restriction against "religious worship services," characterizing SOP § 5.11 as merely the exclusion of "the conduct of an event or activity that includes expression of a point of view," Maj. Op. at 13.  The majority does not disagree that Bronx Household's services fall squarely within the purposes of the limited public forum; it holds, however, that SOP § 5.11's exclusion of services is both viewpoint-neutral and justified by Establishment Clause concerns.  Because I believe that neither conclusion is correct, I would affirm the district court's injunction.

---

[1] While I disagree with Judge Calabresi's analysis and conclusions, he at least recognizes that the two parts of SOP § 5.11 operate in tandem to effectively preclude worship and the practice of religion from school premises during non-school hours.

**I. SOP § 5.11's Ban on Religious Worship Services Constitutes Viewpoint Discrimination**

As the majority recognizes, the Board has created a limited public forum by opening its schools for "uses pertaining to the welfare of the community." SOP § 5.6.2. When the state creates such a forum, it "is not required to and does not allow persons to engage in every type of speech." Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106 (2001). The government may, for example, reserve the limited public forum "for the discussion of certain topics." Id. (quoting Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829 (1995)). Any restrictions on speech in a limited public forum must, however, be both viewpoint neutral and "reasonable in light of the purpose served by the forum." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806 (1985). SOP § 5.11 is neither.

Here, the Board opened its schools to the public for purposes of "maximiz[ing] educational, cultural, artistic and recreational opportunities for children and parents," Cahill. Decl. ¶ 13, "assist[ing] in . . . development generally," id., "expand[ing] enrichment opportunities for children," Farina Decl. ¶ 9, and "enhanc[ing] community support for the schools," id. The parties agree, and the majority does not contest, that Bronx Household's intended use of P.S. 15 for "Christian worship services"—which include prayer, the reading and singing of psalms, Bible lessons, personal testimony, communion, preaching,

-4-

fellowship, and conversation—falls within the purposes of the forum. See, e.g., Transcript of Oral Argument, 10/6/2009 ("Tr."), at 10:7-8, 21:20-21, & 22:20-22 (each statement conceding that Bronx Household's intended use advances the forum's purposes). The majority nevertheless finds that the restriction on religious services is content discrimination that is reasonable in light of the purposes of the limited public forum. I disagree and conclude that the Board's discrimination against Bronx Household is based on its religious viewpoint.

The Supreme Court has consistently held that the exclusion of private speakers from open fora or limited public fora on the basis of their religious message constitutes viewpoint discrimination. In Widmar v. Vincent, for example, the Supreme Court reaffirmed that "religious worship and discussion" are "forms of speech and association protected by the First Amendment." 454 U.S. 263, 269 (1981). On this basis, the Court rejected a university's attempt to prevent a student organization from using an open forum to hold meetings, similar to those at issue here, that included "prayer, hymns, Bible commentary, and discussion of religious views and experiences." Id. at 265 n.2. Significantly, the Court rejected a distinction between protected religious speech and "a new class of religious speech act[s] constituting worship." Id. at 269 n.6 (alteration in original) (citation and internal quotation marks omitted). The Court

explained that this proposed distinction lacked "intelligible content" and would not "lie within the judicial competence to administer." Id.

The Supreme Court first addressed private religious speech in a limited public forum in Lamb's Chapel v. Center Moriches Union Free School District, 508 U.S. 384 (1993). There, a church sought to use a school's limited public forum, after hours, to show a six-part film series that dealt with "family and child-rearing issues" from a Christian perspective. Id. at 387-89. The Court found that the school district had engaged in viewpoint discrimination by "permit[ting] school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint." Id. at 393. Similarly, in Rosenberger v. Rector & Visitors of the University of Virginia, the Court rejected the University of Virginia's refusal to fund a student newspaper on the basis that the newspaper "primarily promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. 819, 823 (1995). The Court explained that viewpoint discrimination is a subset of content discrimination and that while it is "something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought," religion nevertheless "provides . . . a specific

-6-

premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." Id. at 830-31. For that reason, the University's refusal to fund a student publication because of its Christian perspective, while continuing to fund publications with other (secular) perspectives, was impermissible viewpoint discrimination. Id. at 831-32.

More recently, in Good News Club v. Milford Central School, 533 U.S. 98 (2001), the Supreme Court applied its holdings in Lamb's Chapel and Rosenberger to activities that could be labeled "worship." Milford had created a limited public forum that, like SOP § 5.6.2 here, opened its school for purposes "pertaining to the welfare of the community." Good News Club, 533 U.S. at 102. The Good News Club, a private Christian organization, sought to use this forum for weekly meetings, at which participants would "sing[] songs, hear[] a Bible lesson and memoriz[e] scripture." 533 U.S. at 103. In finding Milford's exclusion of these meetings unconstitutional, the Court explained that "something that is 'quintessentially religious' or 'decidedly religious in nature' can[] also be characterized properly as the teaching of morals and character development from a particular viewpoint." Id. at 111. While declining to challenge Justice Souter's characterization of the Club's activities as "an evangelical service of worship," the Court wrote that "what matters is the

substance of the Club's activities," which the Court found to be "materially indistinguishable from the activities in Lamb's Chapel and Rosenberger." Id. at 112 n.4. Because non-religious groups were permitted to teach morals and character development from a secular viewpoint, excluding the Good News Club's efforts to do the same from a religion viewpoint was impermissible.

The majority argues in this case that the Board has not discriminated on the basis of viewpoint and tries to distinguish these prior Supreme Court decisions by focusing narrowly on the Board's exclusion of "religious worship services." The Board, however, has not differentiated these services from religious worship or the practice of religion. Indeed, how could it do so? Nor has the Board offered a definition of religious worship services. Rather, the majority offers its own self-styled definition of "religious worship services," without reference to the record or briefs, as "the conduct of a particular type of event: a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion," the conduct of which "has the effect of placing centrally, and perhaps even of establishing, the religion in the school." Maj. Op. at 12. The majority's formulation of "religious worship services," including its shoe-horning of a supposed Establishment Clause problem, is

conveniently tailored to support its arguments, but leaves no doubt that it is "religious services" and "worship" that the Board is targeting for exclusion.  The Board is otherwise unconcerned with comparable ceremonial speech occurring on school premises.[2]  The majority's definition, it bears noting, leads to anomalous results: while a Catholic or Episcopal service would be shut out of the forum, a Quaker meeting service, Buddhist meditation service, or other religions worship convocation could be allowed because it would not follow a "prescribed order" or because the leader is not "ordained."  Ultimately, the majority's definition also obscures the central issue, barely discussed in the majority opinion, of whether Bronx Household is engaging in speech that fulfills the purposes of the forum and is consistent with non-religious speech occurring on school premises.

The core of the majority's argument is that by prohibiting "religious worship services," the Board has only prohibited "the

---

[2]  Indeed, the majority's attempt to differentiate between the "conduct of services," which it defines as "the performance of an event or activity," Maj. Op. at 11, and the conduct of "religious worship services" as two distinct categories of activity relies explicitly on the religious nature of the latter activity.  Whereas a Boy Scouts merit badge service constitutes "a collective activity characteristically done according to an order prescribed by and under the auspices of an organized [civic group]" and is "typically . . . conducted by an . . . official of the [group]," Maj. Op. at 12, Bronx Household's weekly "event or activity" is barred solely because it is performed under the auspices of an organized <u>religion</u> and conducted by an <u>ordained</u> official of the <u>religion</u>.  Thus, these purportedly distinguishing criteria squarely depend on the fact that religion is the underlying motivation for the expressive activity.

conduct of an event or activity that includes expression of a point of view," rather than "excluding the expression of that point of view." Maj Op. at 12. The majority's attempt to differentiate between the conduct of an event, here labeled "services," and the protected viewpoints expressed during the event is futile because the conduct of "services" is the protected expressive activity of the sort recognized in Good News Club and, earlier, in Widmar. The majority turns its back on the Supreme Court's holding in Good News Club that it is viewpoint discrimination for a school to exclude what is effectively "an evangelical service of worship" from a limited public forum that in every material respect is identical to the forum that the Board established in this case. Compare Good News Club, 533 U.S. at 112 n.4, with id. at 137-38 (Souter, J., dissenting). The Board cannot lawfully exclude the conduct of an event based solely on the religious viewpoints expressed during the event.

Indeed, in rejecting the claim that religious worship is not protected speech in Widmar, Justice Powell explained that a carve-out of worship from protected religious speech does not have intelligible content and likely would not "lie within the judicial competence to administer." 454 U.S. at 269 n.6. The carve-out, Justice Powell wrote, also lacks "relevance" because there is "no reason why the Establishment Clause, or any other provision of the Constitution, would require different treatment

-10-

for religious speech designed to win religious converts than for religious worship by persons already converted." Id. (citation omitted).

Fixing upon the label "services" for the program of worship at issue here as a carve-out from protected speech–as opposed to other characterizations such as "meeting," "gathering," "prayer group," or "time of worship"–does nothing to resolve the underlying carve-out problems identified by Justice Powell in Widmar. The same concerns–lack of intelligible content, judicial manageability, and relevance–persist. While the majority tries to address these concerns through its own definition of services, the concerns raised in Widmar adhere in the application of the majority's definition. It is as difficult for a court to ascertain when it is dealing with "services" as with "worship" generally and to manage any such distinction. And ultimately, any distinction between "services" and protected religious speech is irrelevant because, regardless of labels, "what matters is the substance of the [group's] activities." Good News Club, 533 U.S. at 112 n.4.

Moreover, that SOP § 5.11 exclusively targets religious viewpoints is evident from the fact that, as in Good News Club, only "religious" services are shut out of the forum. No similar restriction is placed on secular gatherings that are materially indistinguishable from Bronx Household's use of P.S. 15. While

the Board denies Bronx Household a space to celebrate its ideals, it permits other outside organizations, such as the Legionnaire Greys Program and the Boy Scouts, to meet on school premises to further their secular ideals of "military leadership," or "character building, citizenship, and personal and physical fitness."  The Board permits these secular uses despite the fact that these groups also meet according to a prescribed order of conduct that they consider integral to the accomplishment of their goals.  See, e.g., 1st Aff. of David Laguer, at ¶¶ 3, 4, & 6 (describing Legionnaire Greys Program meetings as "structured and ordered," each consisting of, inter alia, a ceremonial flag presentation, trumpets playing the national anthem, flag salutes, unit lessons, leadership training, and character building); Aff. of Jeffrey G. Fanara, at ¶¶ 5, 6, & 8 (describing Boy Scout troop meetings as consisting of a "pre-opening, a half-hour gathering period, . . . a formal opening ceremony . . . with a flag ceremony and [ ] a recitation of the Pledge of Allegiance and the Scout Oath or Law," and a "closing ceremony" that "includes a motivational message . . . based on Scouting's values").  There can be little doubt that the Board would similarly allow the use of its facilities by fraternal organizations, such as the Elks or the Freemasons, with comparable missions and ceremonies.

Just as each of these groups meets to address and discuss universal concerns while advancing its organizational mission, so

too does Bronx Household's "Sunday morning meeting [act as] the indispensable integration point for [the group].  It provides the theological framework to engage in activities that benefit the welfare of the community."  First Aff. of Robert Hall ("1st Hall Aff."), at ¶ 7.  Further, it is during Bronx Household's gatherings that participants are taught "to love their neighbors as themselves, to defend the weak and disenfranchised, and to help the poor regardless of their particular beliefs.  It is a venue where people . . . come to talk about their particular problems and needs."[3]  Id.  Plainly, there can be no claim that Bronx Household's gatherings fail to address subjects that are otherwise permitted in the forum or that they differ from secular groups' meetings in any way other than their invocation of religious doctrine.[4]

---

[3]  For this reason, the majority errs by distinguishing Good News Club on the basis of the Supreme Court's statement that the Club meetings in that case did not involve "mere religious worship."  533 U.S. at 112 n.4; see Maj. Op. at 25, 38.  The majority, however, omits a critical modifier:  the Court made clear that it did not consider the Club's activities to be "mere religious worship, divorced from any teaching of moral values."  Id. (emphasis added).  The same is true here:  Bronx Household's worship services cannot be divorced from the teaching of moral values that are part and parcel of those services, which include Bible lessons and instruction.  Indeed, how can the majority's conception of religious worship services ever be divorced from promoting moral values?

[4]  While this case was argued under the First Amendment's Free Speech and Establishment Clauses, the Board's action also raises Free Exercise Clause concerns.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or

The majority also relies on a number of hypothetical activities to argue that the Board could deny a permit application in order to avoid "either harm to persons or property, or liability, or a mess, which those activities may produce." Maj. Op. at 13. Irrespective of the Board's power to deny permits for such hypothetical uses out of a concern for safety, sanitation, and non-interference with other uses of the schools, see Capitol Square Review & Adv. Bd. v. Pinette, 515 U.S. 753, 758 (1995), none of these concerns has ever been present in this case. Strikingly, while quick to proffer these hypothetical uses, the majority never comes to grips with the significant fact that the Board allows most outside organizations

---

regulates or prohibits conduct because it is undertaken for religious reasons." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993); see also Employment Div., Dep't of Human Res. of Ore. v. Smith, 494 U.S. 872, 877 (1990). Thus, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral; and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." Church of the Lukumi Babalu Aye, 508 U.S. at 533 (internal citation omitted). Given the plain language of SOP § 5.11, the Board's persistent exclusion of outside organizations seeking to use school facilities for religious purposes, and the Board's repeated statements that SOP § 5.11 is aimed at the practice of religion, it is undisputable that SOP § 5.11 is not neutral. See Smith, 494 U.S. at 877-78. Because SOP § 5.11 specifically burdens religious practices, it must advance a compelling government interest to pass constitutional muster. See id. at 894-95 (O'Connor, J., concurring). Such a compelling interest is absent in this case for the reasons stated in Part II.

-14-

to access its facilities for uses that "pertain[ ] to the welfare of the community" and "promot[e] [children's] development generally," so long, of course, as those organizations' activities do not amount to <u>religious</u> worship services or transform the school into a "house of worship."  Despite the majority's arguments to the contrary, it is readily apparent that the Board singles out religious worship for disfavored treatment.  The majority's argument that SOP § 5.11 is nothing more than a content-based restriction on a specific type of activity, albeit a religious one, plainly fails.[5]

Finally, the majority argues that my finding of viewpoint discrimination overlooks the Board's Establishment Clause rationale.  Maj. Op. at 33-37.  As an initial matter, I disagree that the Board's Establishment Clause concerns are reasonable, for the reasons discussed in Part II.  Nevertheless, even if the Board were to have legitimate Establishment Clause concerns,

---

[5]  The Board's separate reliance on <u>Faith Center Church Evangelistic Ministries v. Glover</u>, 480 F.3d 891 (9th Cir. 2007), to argue that SOP § 5.11 is content, not viewpoint, discrimination is misplaced.  In <u>Faith Center</u>, the Ninth Circuit concluded that Contra Costa County's exclusion of a religious congregation from its library meeting space was content, not viewpoint, discrimination because the congregation's intended use of the space during normal operating hours for "Praise and Worship" services was incompatible with (a) the purpose for which the meeting room forum had been created, and (b) the "library's primary function as a sanctuary for reading, writing, and quiet contemplation . . . available to the whole community."  <u>Id.</u> at 902, 909-11.  No such incompatibility in either purpose or facility is present here.

-15-

those concerns could do nothing to undermine my conclusion that the Board engaged in viewpoint discrimination; at most, they could only serve as a potential justification for such discrimination.

Thus, whether the Board's actions under SOP § 5.11 are properly characterized as the exclusion of worship, the exclusion of "religious worship services," or the exclusion of "the <u>conduct of an event or activity</u> that includes expression of a [religious] point of view," Maj. Op. at 13, the Board has discriminated against Bronx Household on the basis of religious viewpoint. The group's proposed use of P.S. 15 fits plainly within the purpose of the limited public forum created under SOP § 5.6.2; is not incompatible with any time, place, and manner restrictions imposed by the Board; and has been denied solely because Bronx Household wishes to address otherwise permissible subjects from a religious viewpoint through its conduct of religious "worship services."

## II. Bronx Household's Intended Use of P.S. 15 Raises No Legitimate Establishment Clause Concerns

After concluding that SOP § 5.11 is content discrimination, the majority next considers the reasonableness of SOP § 5.11. However, it does so not in light of the forum's stated purposes, but rather in light of the Board's stated concern that allowing the conduct of "religious worship services" in schools would give

-16-

rise to a sufficient appearance of endorsement to constitute a violation of the Establishment Clause.  See Maj. Op. at 19. Unlike my colleagues in the majority and the Board, I am not prepared to shut out constitutionally-protected speech from a neutral forum on the sole basis that it is "quintessentially religious."  Good News Club, 533 U.S. at 111.  I would hold that the actions of Bronx Household, a private party, cannot transform the government's neutral action into an Establishment Clause violation.  The Board's fear of being perceived as establishing a religion is therefore not reasonable, if the exclusion is viewed (erroneously) as content discrimination, much less sufficiently compelling to justify the viewpoint discrimination that I believe is occurring.

Just like the defendants in Widmar, the Board and the majority "misconceive[] the nature of the case."  454 U.S. at 273. The Board has not created a forum open only to religious speech. Rather, "it has opened its facilities for use by [the community], and the question is whether it can now exclude groups because of the content of their speech."  Id.  In fact, the Supreme Court has "[m]ore than once . . . rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design." Rosenberger, 515 U.S. at 839 (citing Lamb's Chapel, 508 U.S. at

393-94; Bd. of Educ. of Westside Cmty. Sch. (Dist. 66) v. Mergens, 496 U.S. 226, 248, 252 (1990)). Because the Establishment Clause looks only to the government's role, if any, in establishing religion and not the private speaker's choice in exercising his free speech rights, I reach the opposite conclusion from the majority as to whether a reasonable person would perceive the Board's grant of the neutral-forum permit sought here to be an endorsement of religion.

The Board and the majority invoke Lemon v. Kurtzman, 403 U.S. 602 (1971), to demonstrate that SOP § 5.11 is reasonable, but they misapply the Lemon test, thereby reaching several conclusions that directly contradict controlling Supreme Court precedent. In particular, the majority offers five bases for concluding that SOP § 5.11 is reasonably based on the Board's supposed concern that granting Bronx Household a permit for "Christian worship services" might have the "principal or primary effect" of endorsing religion, see id. at 612, thereby violating the Establishment Clause.[6] The battle that the majority and the Board wish to

---

[6] The five bases the majority cites are as follows: (1) after-hours use of school premises for "religious worship services" transforms the school into a church because "[t]he church has made the school the place for the performance of its rites," Maj. Op. at 20; (2) the Board might reasonably fear that allowing access for "religious worship services" results in the Board's substantial subsidization of religion, Maj. Op. at 21; (3) granting access for "religious worship services" might permanently convert a school on Sundays into a state-subsidized church "by reason of public perception of endorsement" that "is made particularly acute by the fact that P.S. 15 and other

-18-

fight, however, has already been lost. The Supreme Court has rejected Establishment Clause concerns, including those raised by the majority, in this context because they are premised on the mistaken belief that permitting religious groups to use school facilities for religious purposes on a non-school day in a neutral forum creates a realistic danger that the public will perceive the Board as endorsing religion.

The relevant question to be asked is not whether any person might mistakenly perceive the Board as conveying a message of endorsement or disapproval; rather, the endorsement test asks whether "an objective observer, acquainted with the text, legislative history, and implementation of the [challenged law or policy], would perceive it as a state endorsement of [organized religion] in public schools." Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308 (2000) (emphasis added) (quoting Wallace v. Jaffree, 472 U.S. 38, 73, 76 (1985) (O'Connor, J., concurring)). Thus, the majority confuses its analysis when it emphasizes the private speaker's conduct, rather than the government's role, in establishing religion. The fact that a community member might

---

schools used by churches are attended by young and impressionable students," Maj. Op. at 22-23; (4) increased availability of Sunday permits would favor Christian groups over other denominations, see Maj. Op. at 23-24; and (5) deliberate exclusion of certain members of the general public, such as persons excommunicated from the church who advocate the Islamic religion, by a religious organization aggravates existing Establishment Clause concerns, see Maj. Op. at 24.

-19-

witness an outside organization using a school during non-school hours to further its religious cause does not in itself raise a legitimate concern that the government has acted in contravention of the Establishment Clause.  See Capitol Square, 515 U.S. at 767 (Scalia, J., for the plurality) ("By its terms th[e] [Establishment] Clause applies only to the words and acts of government. It was never meant, and has never been read by this Court, to serve as an impediment to purely private religious speech connected to the State only through its occurrence in a public forum." (emphasis in original)).

For these reasons, the majority's focus on the "religious nature" of the speech, without regard to the nature of the speaker, is misplaced.  The majority cites McCreary County v. ACLU, 545 U.S. 844 (2005); County of Allegheny v. ACLU, 492 U.S. 573 (1992); and Lee v. Weisman, 505 U.S. 577 (1992), as foundational to its Establish Clause analysis, and of course they would be highly relevant to this case were we dealing with religious speech by the government.  In McCreary and County of Allegheny, the government's placement of the Ten Commandments and a nativity creche, respectively, in county courthouses violated the Establishment Clause, as did the government in Lee v. Weisman when a school official invited a rabbi to give an invocation and benediction at a middle-school commencement exercise.  In the case before us, however, the most the government has done is to open up

-20-

a neutral public forum limited by its laudable educational and community-building purposes.  Unlike in these three cited cases, it has neither promoted nor endorsed a religious message.

Also, "a significant factor in upholding government programs in the face of Establishment Clause attack is their <u>neutrality</u> towards religion."  <u>Good News Club</u>, 533 U.S. at 114 (quoting <u>Rosenberger</u>, 515 U.S. at 839).  Indeed, the Free Speech Clause's requirement of viewpoint neutrality by the government in opening a forum tends to undermine, if not preclude, a finding of school sponsorship in the Establishment Clause context.  <u>See</u> <u>Good News Club</u>, 533 U.S. at 114 ("Because allowing the Club to speak on school grounds would ensure neutrality, not threaten it, [the school district] faces an uphill battle in arguing that the Establishment Clause compels it to exclude the Good News Club.").[7] To an objective, fully informed observer, the fact that the forum is open to a wide spectrum of participants bespeaks the state's

---

[7] Indeed, it bears noting that it was, at least in part, the Second Circuit's previous approval of the Board's rejection of Bronx Household's permit application pursuant to an earlier formulation of the religious-use prohibition ("No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school.") that prompted the Court to grant certiorari in <u>Good News Club</u>.  <u>See</u> 533 U.S. at 105-106 (citing <u>Bronx Household I</u> as one of a number of circuit court cases contributing to a circuit conflict "on the question whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech").  It would not have been unreasonable for the Court to have expected that its <u>Good News Club</u> decision would end this case as well.

-21-

neutrality, not its favoring of religion or any other group.

In any event, even if a private actor's conduct could somehow transform a neutral forum into a state endorsement of religion, Bronx Household's services would not do so here. Just as in Lamb's Chapel and Good News Club, Bronx Household's use of P.S. 15 takes place during non-school hours (actually on a day when there is no school), lacks school sponsorship, occurs in a forum otherwise available for a wide variety of uses, and is open to the public. See 1st Hall Dep. at 30 ("Worship services are always open to the public."); 1st Hall Aff., ¶ 5 ("Our Sunday morning meetings are open to all members of the public. The meetings are not closed to a limited group of people, such as church members and their guests.").[8] And while the majority in this case cites the "particularly acute" danger that young and impressionable students will perceive the weekend use of their schools by religious groups as the Board's endorsement of religion or certain religious denominations, see Maj. Op. at **[23]**, the Supreme Court

---

[8] While Bronx Household, in accordance with its religious tenets, limits communion to church members who have been baptized, all members of the public are free to attend its Sunday worship services and there is no evidence that Bronx Household has ever refused admission to anyone. The majority's statement that Bronx Household "excludes. . . persons who have been excommunicated or who advocate the Islamic religion from full participation in its services," Maj. Op. at 23, rests on Pastor Robert Hall's answers to hypothetical questions posed to him by the Board during his deposition that specifically addressed church membership, not public attendance at Sunday worship services. See 2nd Hall Dep. at 35-42.

-22-

rejected this same argument in Good News Club, where it was presented with facts less favorable to Good News Club than those the majority cites to here. See, e.g., Good News Club, 533 U.S. at 117-18. Specifically, the Good News Club's activities took place directly after school and catered to children ages 6-12, id.; here, by contrast, Bronx Household's services occur on Sundays, when the only children present at the school are those attending the services, presumably with their parents.

The majority argues at some length that permitting weekly worship services at P.S. 15 transforms the school into a church. See, e.g., Maj. Op. at 20 ("When worship services are performed in a place, . . . [t]he place has, at least for a time, become the church."). The majority then equates permitting worship services to "subsidizing churches" and "allowing schools to be converted into churches." Maj. Op. at 21. The "church" reference appears no less than twelve times in the majority opinion. Such an argument—that somehow a neutral forum is physically (or perhaps metaphysically) transformed into a non-neutral forum by the private activity undertaken there—has the feel of rhetoric. The same claim could have been made in Widmar and Good News Club, in which decidedly church-related activities were permitted to occur on a regular basis. Bronx Household's services do not convert P.S. 15 into a church any more than the Boy Scout's meetings convert it into a Boy Scout lodge.

-23-

The majority also errs in relying on the fact that some outside religious organizations may more easily obtain school-use permits because they worship on Sundays, not Fridays and Saturdays.  See Maj. Op. at 23-24.  An Establishment Clause violation does not result from either private choice or happenstance.  See Zelman v. Simmons-Harris, 536 U.S. 639, 652 (2002); Good News Club, 533 U.S. at 119 n.9; Harris v. McRae, 448 U.S. 297, 319 (1980) ("[I]t does not follow that a statute violates the Establishment Clause because it happens to coincide or harmonize with the tenets of some or all religions." (internal quotation marks omitted)).  Moreover, that an increasing number of Christian groups have sought Sunday-use permits under SOP § 5.6.2 does not equate to permit unavailability for other religious groups.  Indeed, while the majority states that "Jews and Muslims generally cannot use school facilities for their services because the facilities are often unavailable on the days that their religions principally prescribe for services," Maj. Op. at 23-24, the record is clear that Jewish and Muslim groups have been granted weekend access to school premises across the city under the community use policy.  See, e.g., J.A. at 88 (Friday permit for Downtown Synagogue's "religious services"); id. at 185 (Saturday permit for Downtown Synagogue's "religious services"); id. at 179 (Saturday permit for Hope of Israel's "fellowship meetings"); id. at 183 (Saturday permit for Khal Bais Yitzchok's

-24-

"religious fellowship meetings"); id. at 229 (Saturday permit for Muslimmah of NA's "religious services").[9] Finally, the majority's reliance on County of Allegheny v. ACLU, 492 U.S. 573 (1989), and Lynch v. Donnelly, 465 U.S. 668 (1984), is misplaced because those cases "neither hold[ ] nor even remotely assume[ ] that the government's neutral treatment of private religious expression can be unconstitutional." Capitol Square, 515 U.S. at 765 (Scalia, J., for the plurality).

Supreme Court caselaw also refutes the Board's argument that granting Bronx Household Sunday access to P.S. 15 constitutes direct aid to religion because it allows Bronx Household to bypass the expensive New York City real estate market that might otherwise preclude it from establishing a congregation. Cf. Maj. Op. at 21. The Board's argument runs afoul of Rosenberger:

---

[9] The majority relies on the Board's denial of one group's request to hold Jewish services on Saturdays in a school generally used for Christian services on Sundays in support of its argument that permits are unavailable to Jewish and Muslim groups. See Maj. Op. at 24. While the Board implies that there is a lack of availability of Friday and Saturday permits for use of its 1,197 buildings, its own evidence demonstrates that approximately 750 buildings are available for after-school use on Fridays, that 400 buildings are available for Saturday use, and that 900 buildings are available for Sunday use. See Appellant's Br. at 13-14. Thus, that some religious denominations use school premises more often than others may simply indicate their lack of other adequate meeting space in the community and not any increased ability on their part to secure a permit. See 2nd Hall Dep. at 105-06. That some religious groups utilize the extended use policy more than others simply does not give rise to a legitimate perception that the Board grants permits to particular denominations to the exclusion of others.

-25-

It does not violate the Establishment Clause for a [school] to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups, <u>including groups that use meeting rooms for sectarian activities, accompanied by some devotional exercises</u>. . . . The government usually acts by spending money. Even the provision of a meeting room, as in <u>Mergens</u> and <u>Widmar</u>, involved governmental expenditure, if only in the form of electricity and heating or cooling costs. The [analytical] error . . . lies in focusing on the money that is undoubtedly expended by the government, rather than on the nature of the benefit received by the recipient. If the expenditure of governmental funds is prohibited whenever those funds pay for a service that is, pursuant to a religion-neutral program, used by a group for sectarian purposes, then <u>Widmar</u>, <u>Mergens</u>, and <u>Lamb's Chapel</u> would have to be overruled.

515 U.S. at 842-43 (emphasis added). Even Justice Souter, who dissented in <u>Rosenberger</u>, agreed that the government does not provide impermissible direct aid to religion each time a non-government speaker utilizes a limited public forum for private religious speech. <u>See id.</u> at 888 (Souter, <u>J.</u>, dissenting). Thus, established Supreme Court precedent effectively forecloses the argument that permitting Bronx Household access to P.S. 15 for the purpose of engaging in private religious speech results in the Board's unlawful provision of direct aid to a religious group.

In sum, while the majority argues that allowing Bronx Household weekly use of P.S. 15 for "religious worship services" would force the Board to render direct aid to religion, convey a message that the Board endorses religion over non-religion, and exhibit a preference for certain religious denominations over others, these arguments are without merit. Rather, the neutrality

of the forum is preserved when religious speech, like non-religious speech, is allowed.  Accordingly, if <u>Lemon v. Kurtzman</u> is to apply,[10] I would hold that the Board has failed to demonstrate that granting Bronx Household Sunday access to P.S. 15 for worship services would have the principal or primary effect of advancing religion or otherwise conveying a message of endorsement.[11]  While I would require the Board to demonstrate some sort of government endorsement (an uphill task, to say the least, given the Free Speech Clause's requirement of forum neutrality) before allowing it to restrict the viewpoint advanced by private religious speech that otherwise falls within the purposes of the

---

[10] The Supreme Court recently noted that many of its Establishment Clause cases "have not applied the <u>Lemon</u> test," while others "have applied it only after concluding that the challenged practice was invalid under a different Establishment Clause test."  <u>Van Orden v. Perry</u>, 545 U.S. 677, 686 (2005).

[11] The majority cites <u>Capitol Square</u> for the proposition that a private religious group may so dominate a forum so as to convey a message of governmental approval.  <u>See</u> Maj. Op. at 21.  While Bronx Household's four-hour use of P.S. 15 on Sundays hardly dominates the limited public forum the Board has created under SOP § 5.6.2, any concern over a given group's prolonged or dominant use of the forum can be addressed through reasonable time, place, and manner restrictions.  For example, in order to ensure greater weekend availability of a particular school's facilities to more outside organizations, the Board could limit the number of times per year that any one outside organization may use school facilities.  Likewise, the Board may revoke any organization's permit if it fails to adhere to neutral rules imposed by the Board, i.e., by failing to include the Board's sponsorship disclaimer in written materials or by actively creating an impression of school sponsorship.  The majority's reliance on <u>Pleasant Grove City</u>, <u>see</u> Maj. Op. at 20, is similarly misplaced.

-27-

forum, the lack of a basis in law for the Board's establishment concerns undermines any holding that SOP § 5.11 is reasonable, even under the majority's flawed analysis that SOP § 5.11 is mere content discrimination, much less a compelling justification for the Board's viewpoint discrimination.

* * * * * *

I have no doubt that this case stirs deep feelings and carries implications far broader than the Board's exclusion of Bronx Household's "Christian worship services" under SOP § 5.11. This case also presents important doctrinal considerations worthy of the Supreme Court's attention. In the meantime, however, as a result of the majority's decision that "religious worship services" can be barred from the neutral limited public forum the Board created under SOP § 5.6.2, numerous religious groups that provide recognized benefits to the people and their communities, consistent with the forum's purposes, will be denied access to otherwise available school space simply because their private speech is intertwined with their standard devotional practices and deeply-held religious beliefs. Others will be chilled. Because SOP § 5.11's ban on religious worship services violates the Free Speech Clause, I respectfully dissent.